# United States Court of Appeals
## For the First Circuit

No. 24-1594

BRANDON VELEZ,

Plaintiff, Appellant,

v.

RACHAEL EUTZY; ERIK SLOCUM; CASEY SEIGLE;
CITY OF MANCHESTER, NEW HAMPSHIRE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Barron, Chief Judge,
Breyer,[*] Associate Justice,
and Kayatta, Circuit Judge.

Madeline Meth, Boston University Appellate Clinic, with whom Stephen T. Martin, Seth J. Hipple, and The Law Offices of Martin & Hipple, PLLC were on brief, for appellant.

Keelan B. Forey, with whom Matthew V. Burrows and Gallagher, Callahan & Gartrell, P.C. were on brief, for appellees.

---

[*] Hon. Stephen Breyer, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

September 16, 2025

**KAYATTA**, <u>Circuit Judge</u>.  This case arises out of a traffic stop in Manchester, New Hampshire, which escalated into a physical struggle between several police officers and Brandon Velez.  After Velez did not immediately comply with orders to step out of his vehicle, two officers physically attempted to remove him and overcome his firm resistance.  In the process, one officer struck Velez four times and tased him twice.  Velez later sued several of the officers and the City of Manchester (the "City") under federal and state common law for injuries he sustained during the incident.  In response, they filed a motion for summary judgment, which the district court granted.  <u>Velez</u> v. <u>Eutzy</u>, No. 23-cv-44-SM-TSM, 2024 WL 2959656, at *1 (D.N.H. June 12, 2024).  Velez now appeals.  While we conclude that one of the officers used excessive force, we affirm the district court on all counts.

**I.**

As captured in full by the officers' body cameras, the traffic stop and ensuing altercation unfolded as follows.  On February 22, 2021, shortly after 1:00 a.m., Velez was driving from a local convenience store back to his apartment in Manchester.  On patrol in a marked police cruiser, Manchester police officers Rachael Eutzy and Erik Slocum noticed that Velez's vehicle had a broken headlight.  They made a U-turn and began to follow Velez, during which time they noticed that Velez's vehicle also had a

broken taillight.  As they followed Velez, he accelerated, turned left, and then made another left, which the officers viewed as an attempt to elude them.  Shortly thereafter, Velez pulled into his parking spot, located near where the officers first saw him, and turned off the car's engine.  Velez denies that he was attempting to avoid the officers and argues that he did not see the police car's blue lights, which the officers activated while he was turning off the main road, until he was already parked.

Slocum later declared by affidavit that the address where Velez parked had prior associations with drugs and prostitution.  The officers exited the police car and approached Velez's vehicle.  Velez was sitting in his car and had both of his hands up.  According to Velez, he had not rolled down his car window because the window was not working.

Eutzy wore a full department uniform with badge and insignia.  She approached the driver's side and said, "Hey, how we doing?"  She then opened the driver's side car door.  Velez responded, "Why [are] you opening my door? First off, I live here. That's so disrespectful."  Eutzy replied, "Okay, okay.  How is that disrespectful?" Velez said:  "You're not supposed to open my door just like that."  Eutzy's tone then became stern, as she instructed Velez to "[s]top talking."  Velez then said, "Okay, hold up," and reached into his left pocket to retrieve what turned out to be a cell phone.  Immediately, Eutzy instructed him to

"[g]et your hands out of your pockets." She told him to "[g]o ahead and hop out." Rather than complying, Velez responded, "No. No. You can't, you can't do that." Eutzy then grabbed Velez's arm and began to pull him out of the car. Velez resisted and began shouting, "Why are you doing this? Why are you doing this? You haven't even told me why you pulled me over."

Slocum, who had by this point come around to the driver's side, yanked on Velez's neck area and told him to "get out of the fucking car." Velez still resisted. A physical struggle between the officers and Velez ensued, during which Slocum again instructed Velez to "[g]et out of the car" and told him that he was "under arrest." Velez continued to resist getting out of his car, began shouting for help, and appeared to brace himself against the car frame as the officers continued to pull on him. Slocum then hit Velez twice in the abdomen and twice in the head, and tased him twice. After the second tasing, the officers pulled Velez out of the car and onto the ground, where they attempted to handcuff him.

By this point, a third officer had arrived at the scene. Eutzy instructed Velez to "[s]top fighting," and the third officer told him to "get on your stomach, idiot." Velez responded, "I'm not fighting" and repeatedly shouted that he "c[ould]n't breathe." The officers handcuffed Velez behind his back and maneuvered him to a standing position. By this point, seven police officers were on the scene. Slocum asked for Velez's name, and the cadre of

officers led Velez to a police car. At the police station, Velez was charged with two misdemeanors and a traffic violation. He pled guilty to the traffic violation, and the misdemeanor charges were dropped.

On December 9, 2022, Velez sued the City and several of its police officers in state court, alleging a suite of federal and state-common-law claims. The City, Eutzy, Slocum, and another officer who was on the scene named Casey Seigle (collectively, "defendants") removed the case to federal court in January 2023 and moved for summary judgment in March 2024, which the district court granted. Velez now appeals.

## II.

We review an order granting summary judgment de novo, "drawing all reasonable inferences in favor of the non-moving party." Pac. Indem. Co. v. Deming, 828 F.3d 19, 23 (1st Cir. 2016) (quoting Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013)). Against this backdrop, we proceed to Velez's claims.

## A.

We begin with Velez's wrongful-arrest claim (brought pursuant to 42 U.S.C. § 1983) and false-imprisonment claim (brought pursuant to state law). The parties agree that both claims fail if probable cause existed for his arrest. See Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009) ("An arrest

- 6 -

is lawful if the officer has probable cause." (cleaned up)); Ojo v. Lorenzo, 64 A.3d 974, 983 (N.H. 2013) ("[P]robable cause is a defense to a claim for false imprisonment resulting from a warrantless detention.").

The requisites of probable cause are well established. An officer has probable cause to arrest when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). This is an objective inquiry, Town of Sandown, 585 F.3d at 504, and is "determined in light of the information known to the police at the time of the arrest," United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994). At the summary judgment stage, "when the underlying facts claimed to support probable cause are not in dispute, whether those 'raw facts' constitute probable cause is an issue of law that we must determine de novo." Town of Sandown, 585 F.3d at 504.

Eutzy and Slocum claim that they arrested Velez for two reasons: (1) resisting orders to exit the vehicle in violation of N.H. Rev. Stat. Ann. (RSA) 642:2 (2021) and (2) disobeying a police officer by failing to stop when signaled and refusing to provide his name to officers when asked in violation of RSA 265:4. Because

we conclude that the first rationale supplied probable cause for Velez's arrest, we decline to address the second.

As a threshold matter, the officers were clearly entitled to insist that Velez exit his car. See United States v. Coplin, 463 F.3d 96, 102 (1st Cir. 2006) ("[A] police officer may, as a matter of course, require the driver of a car lawfully stopped for a suspected traffic violation to step out of his vehicle."). This rule is rooted in a concern for officer safety. See Pennsylvania v. Mimms, 434 U.S. 106, 111 & n.6 (1977). And the law clearly allows officers to use reasonable force to effect a lawful detention, including force to overbear resistance. See Graham v. M.S. Connor, 490 U.S. 386, 396 (1989).

RSA 642:2 makes it a misdemeanor for anyone to "knowingly or purposely physically interfere[] with a person recognized to be a law enforcement official . . . seeking to effect an arrest or detention of the person . . . regardless of whether there is a legal basis for the arrest." The officers argue that, because "Velez's refusal to exit the vehicle when ordered to by Officer Eutzy was illegal" under RSA 642:2, that refusal supplied probable cause for Velez's subsequent arrest. Insofar as the officers are contending that Velez's verbal refusal to exit the car violated RSA 642:2, they may well be mistaken. RSA 642:2 explicitly states that "[v]erbal protestations alone shall not constitute resisting arrest or detention." But once Eutzy grabbed

- 8 -

Velez's arm to remove him from the car, Velez's physical resistance provided an indisputably sufficient basis for the officers to conclude that Velez was resisting detention and therefore committing a misdemeanor in violation of RSA 642:2.

While New Hampshire's criminal code does not define "detention," its Supreme Court has explained that to "detain" means "to hold or keep in or as if in custody, to keep back, and to stop or delay." State v. Kelley, 899 A.2d 236, 238 (N.H. 2006) (cleaned up). The New Hampshire Supreme Court has also held, in a slightly different context, that a person's physical resistance to an officer's attempt to remove him from a space can qualify as resisting detention under RSA 642:2. See State v. Clay, No. 2018-0184, 2019 WL 1970210, at *3 (N.H. May 2, 2019) (finding a violation of RSA 642:2 where the defendant physically resisted an officer pulling on his arm in order to remove him from a local board meeting). Moreover, New Hampshire courts have described traffic stops, which can include protective frisks, as a form of detention. See State v. McKinnon-Andrews, 846 A.2d 1198, 1201-02 (N.H. 2004); State v. Roach, 677 A.2d 157, 160 (N.H. 1996).

Given this case law, the officers had ample basis to conclude that requiring Velez to exit his car during the traffic stop constituted a form of "detention." Cf. State v. Fleury, 364 A.2d 625, 626 (N.H. 1976) (per curiam) (noting that RSA 642:2's inclusion of the word "detention" was meant "to avoid defenses

based on technical distinction between arrest and other forms of seizures of the person falling short of a full-blown arrest"). They were therefore justified in thinking that Velez's physical resistance to their subsequent attempts to remove him from the car violated RSA 642:2.

Velez argues that an arrest occurred the moment Eutzy grabbed Velez's arm and was therefore unlawful because it was preceded by no physical resistance. But calling the use of force employed to effect a detention per se an arrest would run opposite to the law's recognition that reasonable force can be used merely to detain. See Coplin, 463 F.3d at 102. And it would ignore New Hampshire's statutory distinction between arrest and detention.

Velez finally contends that no reasonable officer could have concluded that Velez was resisting arrest or detention because he was not given an opportunity to submit before force was used on him. But the cases Velez cites for this proposition analyzed this factor in the context of Fourth Amendment excessive-force claims. See Ciolino v. Gikas, 861 F.3d 296, 303-04 (1st Cir. 2017); Gray v. Cummings, 917 F.3d 1, 12-13 (1st Cir. 2019). We therefore address this argument in our excessive-force analysis. Nor do we see how this argument would alter our thinking here, where the video evidence clearly depicts Velez first verbally refusing to get out and then physically resisting the officers' attempts to achieve compliance. We thus affirm the district court's conclusion

- 10 -

that, as a matter of law, the officers had probable cause to arrest Velez, and that Velez's wrongful-arrest and false-imprisonment claims fail as a result.

**B.**

Our conclusion that the officers had probable cause to arrest Velez also disposes of Velez's claim that he was arrested in retaliation for protesting Eutzy's conduct and trying to record their encounter. See Nieves v. Bartlett, 587 U.S. 391, 402 (2019) ("[A] plaintiff pressing a retaliatory arrest claim must [also] plead and prove the absence of probable cause for the arrest."). In any event, the undisputed facts do not support the contention that the arrest was retaliatory. The video clearly shows that the arrest followed Velez's physical resistance to Eutzy's lawful command, rather than simply his protestations. Nor does the record support Velez's assertion that he was arrested for allegedly attempting to record the officers. The body camera footage shows Velez retrieving his phone from his pocket during his colloquy with Eutzy. But he did not turn it on, activate the camera, or otherwise tell the officers that he was planning to record them. And neither Eutzy nor Slocum made any comments about Velez potentially recording the encounter. Cf. Scott v. Harris, 550 U.S. 372, 381 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary judgment.").

For the foregoing reasons, the district court did not err in concluding that, as a matter of law, Velez was not subject to a retaliatory arrest.  We move on.

## C.

### 1.

Velez also brings Fourth Amendment excessive-force and common-law assault-and-battery claims against Eutzy and Slocum. Because "our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the common law assault and battery claim[]," Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010), we focus our analysis on the Fourth Amendment excessive-force claim brought under § 1983.

To determine whether force used in an arrest exceeds what the Constitution allows, we proceed in two steps.  First, we must ascertain the relevant facts and circumstances.  Scott, 550 U.S. at 378.  Here, there is no need to have a trial to determine those facts.  Rather, given the video evidence, the record contains no disputed material facts.  Second, we must determine whether, given those facts, the force used was "objectively reasonable." Id. at 381.  This is a "question of law."  Id. at 381 n.8.

- 12 -

The key question, therefore, is whether the officers used an unreasonable amount of force to effectuate their lawful goal of removing Velez from his car. The border between excessive and acceptable force is often "hazy," with the result that "a reasonable officer sometimes may use unreasonable force." Mlodzinski v. Lewis, 648 F.3d 24, 33 (1st Cir. 2011) (citation omitted). To determine whether an officer used unreasonable force, we consider "the totality of the circumstances." Gray, 917 F.3d at 8. Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

In considering these factors, we distinguish between the actions of Eutzy and Slocum. Though Eutzy initiated the use of force by grabbing Velez's arm after he verbally refused to exit the car, Slocum escalated that force by yanking on Velez's neck area and then hitting and tasing him multiple times soon after. We cannot say that Eutzy's pulling on Velez's arm rose to the level of excessive force. But we are persuaded that the escalating force deployed by Slocum without pause or warning -- to the point of body blows, head blows, and double tasing -- was not reasonable in its entirety.

- 13 -

Many of the Graham factors favor Velez. A trivial offense prompted the stop. Two officers were present, and the situation presented no out-of-the-ordinary threats to their safety (other than the risks incident to even routine stops). See Raiche, 623 F.3d at 37 (noting that the plaintiff posed little threat to officers because he remained in his vehicle and "never displayed any weapons or made any verbal threats"). Nor did Velez pose an active flight risk, since he had parked and turned off his engine.

The district court concluded, Velez, 2024 WL 2959656, at *8 -- and the officers now argue -- that the force deployed was reasonable and necessary once Velez began to resist the officers' efforts to remove him from the car, at least in part to secure their safety. But the resistance here was passive and its resoluteness was untested by a conversation or the passing of even a few moments. And while we do not doubt that Velez's initial resistance justified some use of force, the video discloses no need to have immediately escalated that force to multiple blows and tasing, all within less than a minute from Eutzy's initial instruction that Velez "hop out." Cf. Est. of Armstrong ex rel. Armstrong v. Village of Pinehurst, 810 F.3d 892, 897, 901 (4th Cir. 2016) (concluding that the officers used excessive force where, among other things, an officer tased the plaintiff after thirty seconds of the plaintiff resisting attempts to remove him from a post).

- 14 -

Finally, the officers argue that several cases have described "hard-hand strikes" and "[t]aser deployments" as "legitimate law enforcement tools." True enough. But those cases uniformly involved more obvious threats to law enforcement safety than the circumstances here. See O'Brien v. Town of Bellingham, 943 F.3d 514, 531 (1st Cir. 2019) (plaintiff was "acting irrationally, cursing and threatening the officers, and trying to smash a glass window"); Kenney v. Floyd, 700 F.3d 604, 610 (1st Cir. 2012) (suspect was an "uncooperative motorist[] who posed a continued risk of flight"); Berube v. Conley, 506 F.3d 79, 84-85 (1st Cir. 2007) (plaintiff acted erratically, wielded a hammer against an officer, and disobeyed orders to show his hands); Gaudreault v. Municipality of Salem, 923 F.2d 203, 206 (1st Cir. 1990) (plaintiff was "visibly intoxicated," "yelling at bar employees," "disturbing the patrons," and "vigorously resist[ing] arrest"). They therefore shed little light on whether hard-hand strikes and the tasing of Velez were appropriate in view of the circumstances.

In sum, after evaluating the "totality of the circumstances," Gray, 917 F.3d at 8, we conclude that Slocum violated Velez's Fourth Amendment right to be free from excessive force.

**2.**

All that, though, does not mean that Slocum is liable for damages: The officers invoke a qualified immunity defense. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011), thus shielding from liability "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986). "An officer is entitled to qualified immunity if an objectively reasonable officer could have concluded (even mistakenly) that his or her conduct did not violate the plaintiffs' rights." Johnson v. City of Biddeford, 92 F.4th 367, 375 (1st Cir. 2024) (cleaned up). This is a lenient test by design. We have cautioned against "second-guessing where the officers, acting in the heat of events, made a defensible (albeit imperfect) judgment." Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010).[1]

---

[1] We recognize that "[t]he doctrinal intersection of qualified immunity principles and summary judgment principles" can be murky. Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009). This is "because the summary judgment standard requires absolute deference to the nonmovant's factual assertions," while qualified immunity "demands deference to the reasonable, if mistaken, actions of the [defendant]." Id. at 18-19. To reconcile this tension on an appeal from a final judgment, we follow a two-step approach, "first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Id. at 19.

The district court did not reach the topic of qualified immunity, which was raised by the officers as an alternative basis for summary judgment, instead concluding that no reasonable jury could find that the officers deployed excessive force. See Velez, 2024 WL 2959656, at *8. But both parties brief the issue on appeal. See Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 39 (1st Cir. 2020) (exercising our "discretion to affirm a decision of the district court on alternative grounds," especially where "the parties . . . extensively briefed the" alternative grounds on appeal). And "[t]here can be no question of our power to rely on a different ground than the district court did in affirming its judgment." Sands v. Ridefilm Corp., 212 F.3d 657, 662 (1st Cir. 2000); see also Wilber v. Curtis, 872 F.3d 15, 20 (1st Cir. 2017) (resolving a Fourth Amendment claim on qualified immunity grounds even though the district court did not reach the issue).

Under the doctrine of qualified immunity, Slocum can be held liable only if, at the time of his interaction with Velez, the law "clearly established" that the force that he employed was excessive. See Wilber, 872 F.3d at 21. And whether the law is "clearly established" is itself an issue of law subject to de novo review. Ciolino, 861 F.3d at 302. So, we ask, what law "clearly established" that the amount of force used by Slocum here was excessive?

Certainly, case law clearly established Velez's right "to be free from the use of excessive force by an arresting officer." Morelli v. Webster, 552 F.3d 12, 23-24 (1st Cir. 2009). But that only pins down the right generally; it does not establish that the conduct here violated that right. See Ashcroft, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). Hence, the pivotal inquiry is "whether in the particular factual context of [this] case, a reasonable officer would have understood that his conduct violated the right." Mlodzinski, 648 F.3d at 32-33.

In arguing that we should resolve this inquiry in his favor, Velez first cites a pair of cases -- Raiche, 623 F.3d at 34, and Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341 (1st Cir. 1995) -- that he says clearly establish that the force used on him was excessive. In Raiche, a police officer tackled a man, who was sitting quietly on his stopped motorcycle, to the ground with such force that the man sustained head injuries and the motorcycle was irreparably damaged. 623 F.3d at 34. And in Alexis, the plaintiff was sitting at a restaurant booth when an officer, "without asking or directing [the plaintiff] to get up from the table," violently pulled her out of the booth and across the table, forcibly handcuffed her, dragged her to the police cruiser, and pushed her inside. 67 F.3d at 346.

The force visited on the unwitting plaintiffs in Raiche and Alexis differs materially and obviously from the force used on Velez. In those cases, neither plaintiff was given -- let alone indicated potential noncompliance with -- a verbal order before officers used force on them. Neither plaintiff engaged in any resistance to officers' attempts to detain them. See Raiche, 623 F.3d at 37; Alexis, 67 F.3d at 346. And both Raiche and Alexis involved inflictions of force that were so plainly grievous against the plaintiffs' utter lack of resistance that "the level of force chosen by the officer[s could not] in any way, shape, or form be justified under those facts." Morelli, 552 F.3d at 24. We cannot say that Raiche and Alexis so squarely govern the facts here that they place "the unconstitutionality of the officer[s'] conduct . . . beyond debate." Johnson, 92 F.4th at 375 (citation omitted).

Second, Velez contends, citing Raiche, 623 F.3d at 38-39, and Mlodzinski, 648 F.3d at 38, that even absent on-point case law, it was "obvious" that the officers employed excessive force. We disagree. It is true that a qualified immunity defense cannot succeed if "a general constitutional rule already identified in the decisional law . . . appl[ies] with obvious clarity to the specific conduct in question." United States v. Lanier, 520 U.S. 259, 271 (1997). "[B]ut if 'officers of reasonable competence could disagree' on the lawfulness of the action, defendants are

- 19 -

entitled to immunity." Mlodzinski, 638 F.3d at 33 (quoting Malley, 475 U.S. at 341). Here, Slocum's use of force was not so obviously out-of-bounds that it clearly established by its own terms a constitutional violation. Though we conclude above that excessive force was used, we think the circumstances nonetheless present a close case on which reasonable officers might have concluded otherwise.

"[U]nder the doctrine of qualified immunity, police officers are . . . entitled to reasonable latitude in making judgments about how much force is necessary to overcome resistance." Statchen, 623 F.3d at 17–18. We concluded that Slocum's escalation of force against Velez crossed the threshold from "reasonable" to "unreasonable," given the totality of the circumstances. But this does not mean that the officer's conduct amounted to "plain[] incompeten[ce]" or a "knowing[] violat[ion of] the law." Malley, 475 U.S. at 341. Unlike in Raiche, Alexis, and Mlodzinski, the use of force at issue appears to reflect "the type and kind of erroneous judgment that a reasonable police officer under the same or similar circumstances might have made." Morelli, 552 F.3d at 24. Velez cites no cases clearly establishing otherwise. Thus, qualified immunity precludes liability on Velez's excessive-force claim.

**3.**

"As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims." Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995). But because this practice "is not compelled by a lack of judicial power," we "may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims," so long as "the plaintiff's federal claim is substantial." Id. Exercising this discretion, we turn to whether state immunity resolves Velez's assault-and-battery claim.

Here, Velez himself concedes that "[t]he same standard [as federal qualified immunity] governs New Hampshire immunity for his state-law assault and battery claims." We hold above that federal qualified immunity shields the officers from liability for Velez's excessive-force claim. Assuming New Hampshire law to be as Velez claims, we similarly dispose of his assault-and-battery claim. We thus affirm the district court's conclusion that Velez's common-law assault-and-battery claim fails as a matter of law.

**D.**

Next, Velez argues that a reasonable juror could find under both federal and state law that the City failed to adequately train its officers. A municipality may be held liable under § 1983

- 21 -

if the unconstitutional conduct at issue "implements or executes a policy statement . . . or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 690 (1978). In limited cases, a municipality's "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, 563 U.S. 51, 61 (2011). For this to be the case, a municipality's failure to train "must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." Id. (cleaned up).

To the extent that Velez's claims are predicated on the City's failure to train officers on how to respond to First Amendment-protected conduct, those claims necessarily fail. As we conclude above, Velez's retaliatory-arrest claim does not state a First Amendment violation. And "[i]f . . . the officer has inflicted no constitutional harm, neither the municipality nor the supervisor can be held liable." Wilson v. Town of Mendon, 294 F.3d 1, 6-7 (1st Cir. 2002). We thus center our discussion on Velez's argument that the City did not adequately train its officers on excessive force.[2]

---

[2] There is a colorable argument that Velez has waived this claim. He mentions excessive force in his failure-to-train argument only in relation to his retaliatory-arrest claim, rather than briefing it separately. But because we conclude that Velez's

- 22 -

On this score, though, Velez's argument is thin. When assessing a city's liability under a failure-to-train theory, we focus on the "adequacy of the training program in relation to the tasks the particular officers must perform." City of Canton v. Harris, 489 U.S. 378, 390 (1989). "If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 407 (1997). But Velez does not argue that the City's use-of-force training materials are inadequate. To the contrary, the record shows that Manchester police officers receive training on the proper use of force at the New Hampshire Police Academy. The Manchester Police Department also conducts its own use-of-force training and periodically reviews its use-of-force policy. And all officers are required to undergo annual training on various topics related to law enforcement, including the proper use of force. Velez does not contend otherwise.

Instead, Velez attempts to anchor his municipal liability claim in a single incident of alleged misconduct: his arrest. But "a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."

_____

failure-to-train argument fails as to excessive force, too, we assume without deciding that he has preserved it.

Connick, 563 U.S. at 62 (cleaned up); see also St. Hilaire v. City of Laconia, 71 F.3d 20, 29 (1st Cir. 1995) ("Evidence of a single incident is usually insufficient to establish a custom or usage." (cleaned up)).  This is so because "continued adherence to an approach that [policymakers] know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action -- the deliberate indifference -- necessary to trigger municipal liability." Connick, 563 U.S. at 62 (quotation marks and citation omitted).

Velez parries by invoking a theory of supervisory liability:  He points to Slocum's failure to deescalate the situation, the City's failure to conduct an after-the-fact investigation, and another police officer's approval of Eutzy's and Slocum's uses of force as evidence of "supervisory encouragement, condonation and even acquiescence in the unconstitutional practice."  Bordanaro v. McLeod, 871 F.2d 1151, 1157 (1st Cir. 1989) (quotation marks and citation omitted).  The fact that the officers "acted in concert," Velez asserts, "is further evidence that there was a pre-existing practice of" excessive force.  Id. at 1156.

The mere fact that the officers participated in, or did not object to, the forcible removal of Velez from his car, however, does not perforce demonstrate an unlawful municipal custom. Indeed, we reaffirmed this principle in Bordanaro.  There, we

- 24 -

underscored "that evidence of a single event alone cannot establish a municipal custom or policy," but "where other evidence of the policy has been presented and the 'single incident' in question involves the concerted action of a large contingent of individual municipal employees, the event itself provides some proof of the existence of the underlying policy or custom." Id. at 1156–57. Unlike in Bordanaro, where the jury was presented with additional, uncontroverted evidence of a widespread, unlawful arrest practice, id. at 1156, Velez asks us to infer a municipal custom of inadequate training from the actions of officers during and immediately following one incident of arrest. Velez points to no specific training deficiencies responsible for such supervisory acquiescence. Nor does he establish "that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer[s] involved in a particular incident, is the 'moving force' behind [his] injury." Brown, 520 U.S. at 407–08. In other words, Velez's "approach provides a means for circumventing [the municipal-policy requirement] altogether." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).

Velez's state-law claim fails for many of the same reasons. Under New Hampshire law, a failure-to-train claim sounds in negligence. See Cutter v. Town of Farmington, 498 A.2d 316, 319 (N.H. 1985). The relevant inquiry "is whether the [officers]

- 25 -

were incompetent, inexperienced or unskilled in a way that caused injury, the risk of which was within the scope of their employment and was known to the employer-municipality." Id. at 320. The focal point is not "whether the harm occurred because of the [officers'] inattention or negligence," but whether the employer-municipality "had reason to foresee" that the officers would inflict unwitting harm due to inexperience or incompetence on the job. Id. Here, Velez marshals no evidence suggesting that Eutzy's or Slocum's supervisors, or the City more broadly, "knew or should have known of a risk of [Slocum's] incompetence in the use of force." Levy v. Lique, No. 10-cv-00374, 2012 WL 1600174, at *8 (D.N.H. May 7, 2012). To the contrary, "the uncontested evidence shows that [the officers] received annual training on the broadly utilized continuum of force." Id. Without more, Velez's state-law claim cannot succeed.

## III.

For the foregoing reasons, we affirm the judgment in favor of defendants. The parties shall bear their own costs.