# United States Court of Appeals
## For the First Circuit

No. 18-1303

JUDITH GRAY,

Plaintiff, Appellant,

v.

THOMAS A. CUMMINGS;
TOWN OF ATHOL, MASSACHUSETTS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]
[Hon. David H. Hennessy, U.S. Magistrate Judge]

Before

Kayatta, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Matthew R. Segal, with whom Ruth A. Bourquin, American Civil Liberties Union Foundation of Massachusetts, Inc., Claudia Center, American Civil Liberties Union Foundation, Richard L. Neumeier, and Morrison Mahoney LLP, were on brief, for appellant.

David W. Ogden, Daniel S. Volchok, Alexandra Stewart, Wilmer Cutler Pickering Hale and Dorr LLP, Aaron M. Panner, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Nathalie F. P. Gilfoyle, Deanne M. Ottaviano, and Jennifer Mathis on brief for American Psychiatric Association, American Psychological Association, and

---

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Judge David L. Bazelon Center for Mental Health Law, amici curiae (in support of neither party).

Thomas R. Donohue, with whom Deidre Brennan Regan, Leonard H. Kesten, and Brody, Hardoon, Perkins & Kesten, LLP, were on brief, for appellees.

Eric R. Atstupenas, Christopher J. Petrini, Peter L. Mello, and Petrini & Associates, P.C. on brief for International Municipal Lawyers Association and Massachusetts Chiefs of Police Association, Inc., amici curiae (in support of affirmance).

Pamela B. Petersen on brief for Axon Enterprise, Inc., amicus curiae (in support of affirmance).

February 22, 2019

**SELYA, Circuit Judge**. This appeal arises at the intersection of constitutional law and disability-rights law. It touches upon a plethora of important issues. Some of these issues relate to the appropriateness of a police officer's use of a Taser in attempting to regain custody of a mentally ill person who, after being involuntarily committed, absconded from a hospital. Others relate to the applicability vel non of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-65, to ad hoc police encounters. In the end, we decide the case on the narrowest available grounds and affirm the entry of summary judgment for the defendants.

## I. BACKGROUND

This case has its genesis in an on-the-street encounter between plaintiff-appellant Judith Gray (who suffers from bipolar disorder) and Thomas Cummings, a police officer in Athol, Massachusetts (the Town). Because the case was decided below at the summary judgment stage, we must take the facts in the light most hospitable to the non-moving party (here, Gray), consistent with record support. See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). We caution, though, that we are not obliged to credit "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010).

- 3 -

Here, the raw facts are largely undisputed. In her deposition, Gray testified that she "really [didn't] know what happened" during the incident because she "was in a full-blown manic phase." She added that she "wouldn't know Officer Cummings if [she] fell over him" and that she had reviewed the police report prepared by Cummings and did not know whether or not it accurately described the events that had transpired. Nor did she present any other evidence contradicting Cummings's version of the relevant events. Although we recognize that juries have some leeway to "reject uncontradicted, unimpeached testimony when it is improbable, inherently contradictory, riddled with omissions, or delivered in a manner giving rise to doubts," Quintana-Ruiz v. Hyundai Motor Corp., 303 F.3d 62, 76 (1st Cir. 2002), that principle has no application here. Accordingly, we elicit many of the facts from Cummings's account. See Harriman v. Hancock County, 627 F.3d 22, 34 (1st Cir. 2010) (finding no material factual dispute when plaintiff "had no memory of being beaten by anyone at anytime relevant to this case"); see also Wertish v. Krueger, 433 F.3d 1062, 1065 (8th Cir. 2006) (deeming police officer's version of events "unrefuted" when plaintiff testified that he had very little memory of relevant events). Even so, we draw all reasonable inferences from those facts in Gray's favor.

On May 2, 2013, Gray — who was then fifty-seven years old — experienced a manic episode and called 911. Athol police

officers arrived at Gray's home and transported her to Athol Memorial Hospital. She was admitted to the hospital at around 4:00 a.m., pursuant to Mass. Gen. Laws ch. 123, § 12 (authorizing involuntary "[e]mergency restraint and hospitalization of persons posing risk of serious harm by reason of mental illness"). Approximately six hours later, Gray absconded from the hospital on foot. Hospital staff called the Athol Police Department, asking that Gray — "a section 12 patient" — be "picked up and brought back."

Cummings responded to the call and quickly located Gray, walking barefoot along the sidewalk less than a quarter-mile from the hospital. Cummings got out of his police cruiser. Gray swore at him, and Cummings told her that she "ha[d] to go back to the hospital." Gray again used profanity, declared that she was not going back, and continued to walk away. In response, Cummings radioed for backup and followed Gray on foot. He repeatedly implored Gray to return to the hospital, but his importunings were greeted only by more profanity.

Initially, Cummings followed Gray at a distance of roughly one hundred feet. Within twenty-five to thirty seconds, he closed to within five feet. At that point, Gray stopped, turned around, "clenched her fists, clenched her teeth, flexed her body and stared at [Cummings] as if she was looking right through [him]." She again swore at Cummings and started walking toward

him.  Cummings grabbed Gray's shirt but he could feel Gray moving her body forward, so he "took her to the ground."  It is undisputed that Cummings had a distinct height and weight advantage:  he was six feet, three inches tall and weighed 215 pounds, whereas Gray was five feet, ten inches tall and weighed 140 pounds.

Cummings testified that once on the ground, he repeatedly instructed Gray to place her hands behind her back.  She did not comply.  Instead, she "tucked her arms underneath her chest and flex[ed] tightly," swearing all the while.  Cummings warned Gray that she was "going to get ta[s]ed" if she did not place her hands behind her back.[1]  Gray did not heed this warning but, rather, swore at Cummings again and told him to "do it."  Cummings made "one last final demand [for Gray] to stop resisting" and when "Gray refused to listen," he removed the cartridge from his Taser, placed it in drive-stun mode,[2] and tased Gray's back for four to six seconds.  Gray then allowed him to handcuff her.

_____

[1] Gray testified she was told that she would be tased if she stood up.  She also testified that at some point she was ordered to get to her knees, but that, due to prior injuries, she was unable to obey this order.  Given Gray's repeated statements that she could not recall the details of the encounter and that she could not identify any factual inaccuracies in Cummings's police report, we find these assertions insufficient to refute Cummings's account.  See Wertish, 433 F.3d at 1065.

[2] Drive-stun mode is the least intrusive setting for a Taser: it delivers only a localized impact to the target.  This contrasts with probe-deployment mode, which disrupts the target's entire nervous system.

- 6 -

Cummings helped Gray to her feet and called an ambulance, which transported Gray to the hospital. According to Gray, she felt "pain all over" at the moment she was tased, but she "must have passed out because [she] woke up in Emergency." Charges were subsequently filed against Gray for assault on a police officer, resisting arrest, disturbing the peace, and disorderly conduct, but were eventually dropped.

In due season, Gray sued Cummings and the Town in the federal district court. She invoked federal question jurisdiction, see 28 U.S.C. § 1331, and asserted causes of action under 42 U.S.C. § 1983 and Title II of the ADA, along with supplemental state-law claims for assault and battery, malicious prosecution, and violations of the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 12, §§ 11H-11I. After the completion of pretrial discovery, the defendants moved for summary judgment. See Fed. R. Civ. P. 56(a). The district court referred the opposed motion to a magistrate judge. See 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Following a hearing, the magistrate judge issued a report and recommendation, suggesting that the motion be granted. Specifically, the magistrate judge found no violation of the Fourth Amendment under section 1983 on the part of either Cummings or the Town and no viable state-law claims. As to Cummings, the magistrate judge added that, in any event, he was entitled to qualified immunity. The magistrate judge further concluded that

there had been no abridgement of the ADA because, regardless of Gray's disability, Cummings was entitled to employ an "appropriate level of force in response to an ongoing threat."

Gray objected to the magistrate judge's report and recommendation. See 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). On de novo review, see Mercy Hosp., Inc. v. Mass. Nurses Ass'n, 429 F.3d 338, 343 (1st Cir. 2005), the district court entered a two-sentence text order adopting the magistrate judge's report and recommendation in substantial part. Because the court agreed that Cummings was entitled to qualified immunity, it declined to express any opinion on the magistrate judge's determination that "Cummings employed reasonable force under all of the circumstances."

This timely appeal followed. In addition to the parties' briefs and oral argument, we have had the benefit of able briefing by several amici.

## II. ANALYSIS

We review an order granting summary judgment de novo. See Houlten Citizens' Coal., 175 F.3d at 184. "We will affirm only if the record reveals 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Avery v. Hughes, 661 F.3d 690, 693 (1st Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). Against this backdrop, we proceed to Gray's claims.

## A. __The Section 1983 Claims.__

Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and [federal] laws."  42 U.S.C. § 1983.  To maintain a cause of action under section 1983, "the plaintiff must show a deprivation of a federally secured right."  Harrington v. City of Nashua, 610 F.3d 24, 28 (1st Cir. 2010).  Gray has advanced separate section 1983 claims against Cummings and the Town.  We address these claims sequentially.

**1. __Cummings__.** Gray's section 1983 claim against Cummings is premised on the notion that Cummings used excessive force in effecting her arrest and, thus, violated her Fourth Amendment rights.  To prevail on such a claim, "a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances."  Morelli v. Webster, 552 F.3d 12, 23 (1st Cir. 2009) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).  The degree of force to be used in any given situation is most often a judgment call, which sometimes must be made in a split second by a police officer confronted with rapidly evolving circumstances. Determining whether a particular use of force is reasonable requires consideration of the totality of the circumstances. See Graham, 490 U.S. at 396.  This consideration entails the weighing of a myriad of factors such as "the severity of the crime at issue,

whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight."  Id.

Our starting point is the question of whether a reasonable jury could find that Cummings violated Gray's Fourth Amendment rights through the use of excessive force.  The magistrate judge answered this question in the negative, concluding that, as a matter of law, "the single deployment of a taser in drive stun mode" in these particular circumstances was reasonable.  Viewing the record most hospitably to Gray and drawing all reasonable inferences to her behoof, we think that a reasonable jury could find that the force employed by Cummings violated the Fourth Amendment.  We explain briefly.

The Town's policies describe a Taser in drive-stun mode as a "pain compliance tool."[3]  Thus, the question reduces to whether the circumstances surrounding the confrontation between Gray and Cummings, interpreted in the light most favorable to Gray, justified Cummings's use of such a tool.

The magistrate judge analyzed this question in accordance with the Graham factors.  In his view, the first factor — "the severity of the crime at issue," id. — favored Cummings

_____

[3] This description is consistent with the descriptions found in the case law.  See, e.g., Crowell v. Kirkpatrick, 400 F. App'x 592, 595 (2d Cir. 2010) (explaining that drive-stun mode "typically causes temporary, if significant, pain and no permanent injury").

- 10 -

because "Ms. Gray assaulted [him]." At summary judgment, though, this assessment is insupportable: it fails to view the facts in the light most favorable to Gray.

In this regard, we think it important that Cummings was not called to the scene to investigate a crime; he was there to return a person suffering from mental illness to the hospital. When the subject of a seizure has not committed any crime, the first Graham factor ordinarily cuts in the subject's favor. See Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst, 810 F.3d 892, 899 (4th Cir. 2016). To be sure, Gray did not submit to Cummings's orders. Withal, this failure to obey was at most a minor crime, not one that would tip the first Graham factor in Cummings's favor. See id. at 899-900.

Nor does the alleged assault tilt the scales. In Cummings's view, the assault occurred when, after Gray walked toward him, he grabbed her shirt and she "continued pushing against [his] arm." In the circumstances of this case, we think that a reasonable jury could find that the facts did not support the characterization of Gray's actions as an "assault."

The same kind of defect mars the magistrate judge's determination that the second Graham factor — "whether the suspect poses an immediate threat to the safety of the officers or others," 490 U.S. at 396 — favored Cummings. It is true that Gray was a section 12 patient, that is, an individual who has been

- 11 -

involuntarily committed to a hospital pursuant to Mass. Gen. Laws ch. 123, § 12, based on a determination by a qualified medical professional (or, in emergency situations, a police officer) that "failure to hospitalize [her] would create a likelihood of serious harm by reason of mental illness." Id. § 12(a). It is also true that Cummings knew as much. Although a jury could supportably find on these facts that Cummings reasonably believed that Gray posed a danger to him, it could supportably find instead that Gray — who was shuffling down the sidewalk barefoot and unarmed — only posed a danger to herself (especially given Cummings's distinct height and weight advantage). So, too, a jury could supportably find that, at the time of the tasing, Gray had been subdued to a point at which she no longer posed a threat.

The magistrate judge concluded that the final Graham factor — whether Gray was "actively resisting arrest," 490 U.S. at 396 — favored Cummings. This conclusion seems unimpugnable given Cummings's testimony that he asked Gray several times to put her hands behind her back, but that she would not do so.

The short of it is that the Graham factors point in conflicting directions. Seen through the prism of the totality of the circumstances, the evidence is subject to interpretation and can support plausible though inconsistent inferences. Drawing those inferences beneficially to Gray and aware that Cummings not only had her down on the ground but also outweighed her by some

seventy-five pounds, a reasonable jury could find that Gray had committed no crime and that she posed no threat to Cummings when he tased her.  When all is said and done, we think that Gray has presented sufficient evidence to make out a jury question as to whether Cummings used excessive force.  See, e.g., Morelli, 552 F.3d at 23 (finding triable excessive force claim when officer slammed plaintiff, who "at worst, was suspected of being a petty thief," against wall); Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 353 (1st Cir. 1995) (concluding that jury could find excessive force when officer seized and dragged plaintiff to effectuate arrest for crime of trespassing in public restaurant); see also Estate of Armstrong, 810 F.3d at 906 (finding excessive force when officer tased "mentally ill man being seized for his own protection, [who] was seated on the ground, was hugging a post to ensure his immobility, . . . and had failed to submit to a lawful seizure for only 30 seconds").

This conclusion does not end our inquiry.  Cummings has invoked the defense of qualified immunity.  Qualified immunity is a doctrine aimed at providing government officials (including police officers) a modicum of protection from civil damages liability for actions taken under color of state law.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017), cert. denied, 138 S. Ct. 1311 (2018).  This protection attaches "to all but the plainly incompetent or

those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Thus, a government official may invoke the defense of qualified immunity when his actions, though causing injury, did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Conlogue v. Hamilton, 906 F.3d 150, 154 (1st Cir. 2018) (quoting Harlow, 457 U.S. at 818).

The qualified immunity analysis has two facets: "[t]he court must determine whether the defendant violated the plaintiff's constitutional rights" and then must determine "whether the allegedly abridged right was 'clearly established' at the time of the defendant's claimed misconduct." Id. at 155 (quoting McKenney, 873 F.3d at 81). In this instance, we already have decided that a jury could find that Cummings violated Gray's Fourth Amendment rights. We must now determine whether the alleged right was clearly established at the time of Cummings's violation. See id. Specifically, we must ask whether, given the circumstances at hand, Gray's right to be free from the degree of force that Cummings used — particularly, the Taser — was clearly established.

This question, too, has two facets. First, the plaintiff must "identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir.

- 14 -

2017) (quoting <u>Wilson</u> v. <u>Layne</u>, 526 U.S. 603, 617 (1999)). Second, the plaintiff must demonstrate that "an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." <u>Id.</u> This latter step is designed to achieve a prophylactic purpose: it affords "some breathing room for a police officer even if he has made a mistake (albeit a reasonable one) about the lawfulness of his conduct." <u>Conlogue</u>, 906 F.3d at 155. Taken together, these steps normally require that, to defeat a police officer's qualified immunity defense, a plaintiff must "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." <u>City of Escondido</u> v. <u>Emmons</u>, 139 S. Ct. 500, 504 (2019) (per curiam) (quoting <u>District of Columbia</u> v. <u>Wesby</u>, 138 S. Ct. 577, 590 (2018)); <u>see</u> <u>Anderson</u> v. <u>Creighton</u>, 483 U.S. 635, 639-40 (1987). Although such a case need not arise on identical facts, it must be sufficiently analogous to make pellucid to an objectively reasonable officer the unlawfulness of his actions.[4] See <u>City of Escondido</u>, 139 S. Ct. at 504; <u>Ashcroft</u> v. <u>al-Kidd</u>, 563 U.S. 731, 741 (2011).

---

[4] Sometimes, however, this requirement is relaxed. In circumstances in which a violation of rights is apparent, a plaintiff may thwart a qualified immunity defense simply by demonstrating that "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." <u>City of Escondido</u>, 139 S. Ct. at 504 (quoting <u>Wesby</u>, 138 S. Ct. at 590). This is not such a case.

- 15 -

The district court determined that "the right not to be tased while offering non-violent stationary, resistance to a lawful seizure was not clearly established at the time of the confrontation between Ms. Gray and Officer Cummings" and, therefore, ruled that Cummings was entitled to qualified immunity. We examine the foundation on which this ruling rests.

We begin with Estate of Armstrong, in which the Fourth Circuit conducted a similar qualified immunity analysis. Specifically, the court considered whether the "right not to be subjected to tasing while offering stationary and non-violent resistance to a lawful seizure" was clearly established. 810 F.3d at 907. Armstrong, who suffered from bipolar disorder and paranoid schizophrenia, had absconded from the hospital to which he had been committed. See id. at 896. The police were called and located Armstrong near the hospital's main entrance. See id. Three police officers approached Armstrong, who responded by "wrapping himself around a four-by-four post that was supporting a nearby stop sign." Id. The officers attempted to pry Armstrong's arms and legs loose but were unsuccessful. See id. One of the officers then warned Armstrong that he would be tased if he did not let go of the post. See id. at 897. Armstrong did not comply, and the officer proceeded to tase him five times in drive-stun mode, over a span of approximately two minutes. See id. Even though Armstrong continued resisting, he was pried loose

- 16 -

from the post.  See id.  A struggle ensued, resulting in Armstrong's demise.  See id. at 897-98.

Although the court found that a jury could find the officers had used excessive force, see id. at 906, it nonetheless affirmed summary judgment in favor of the defendants.  The court reasoned that even though its finding that the officers had violated Armstrong's Fourth Amendment rights was supported by precedent, the law "was not so settled [as of April 2011] such that 'every reasonable official would have understood that' tasing Armstrong was unconstitutional" under the circumstances.  Id. at 908 (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam)).[5]

The Fourth Circuit's conclusion in Estate of Armstrong — that the use of a Taser in drive-stun mode against a noncompliant and resisting individual was not clearly unconstitutional as of 2011 — is not an outlier.  Prior to Cummings's encounter with Gray, several other courts of appeals had found the use of a Taser reasonable in situations involving subjects who acted with a level of resistance analogous to that displayed by Gray.  See, e.g., Hagans v. Franklin Cty. Sheriff's Office, 695 F.3d 505, 507 (6th Cir. 2012) (granting qualified immunity for use of Taser in drive-

_____

[5] We note that Estate of Armstrong was decided in 2016 and, thus, Cummings did not have the benefit of the Fourth Circuit's decision at the time of the incident sub judice.

stun mode in 2007 when plaintiff "refused to be handcuffed," "lay down on the pavement and locked his arms tightly under his body, kicking his feet and continuing to scream"); Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (finding single use of Taser in 2001 reasonable when plaintiff "used profanity, moved around and paced in agitation," and "repeatedly refused to comply with [the officer]'s verbal commands" during traffic stop). Thus, an objectively reasonable officer in Cummings's place and stead could reasonably have believed, in 2013, that the use of a Taser was generally permissible when a subject refuses to be handcuffed.

Even so, the level of force that is constitutionally permissible in dealing with a mentally ill person "differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community." Bryan v. MacPherson, 630 F.3d 805, 829 (9th Cir. 2010). Consequently, a subject's mental illness is a factor that a police officer must take into account in determining what degree of force, if any, is appropriate. See Estate of Armstrong, 810 F.3d at 900; Champion v. Outlook Nashville, Inc., 380 F.3d 893, 904 (6th Cir. 2004). Here, however, the only thing that Cummings knew about Gray's mental health was that she had been involuntarily committed under section 12; he did not know whether Gray had been deemed a danger to others or only to herself. Given the skimpiness of this information, we think that an objectively

- 18 -

reasonable police officer, standing in Cummings's shoes, would have had to be prepared for the worst.

Based on the body of available case law, we hold that an objectively reasonable police officer in May of 2013 could have concluded that a single use of the Taser in drive-stun mode to quell a nonviolent, mentally ill individual who was resisting arrest, did not violate the Fourth Amendment. Even if such a conclusion was constitutionally mistaken — as a jury could find on the facts of this case — Cummings is shielded by qualified immunity.

Gray demurs. She identifies two of our precedents and posits that — whether viewed singly or in combination — they evince the clearly established nature of her right to be free from tasing. Both precedents are inapposite.

The case on which Gray relies most heavily is Parker v. Gerrish, 547 F.3d 1 (1st Cir. 2008). There, the plaintiff had been stopped on suspicion of driving while intoxicated. After the plaintiff failed several sobriety tests, the officer tried to arrest him. See id. at 3-4. When the plaintiff resisted, the officer drew his Taser and ordered the plaintiff to turn around and place his hands behind his back. See id. at 4. The plaintiff complied but clasped his right wrist with his left hand. See id. Another officer approached and cuffed the plaintiff's left wrist. See id. There was substantial dispute about what happened next,

but according to the plaintiff's account (to which the court was required to defer in the posture of the case), he released his right wrist, yet was tased anyway. See id. at 4-5. On these facts, we held that the police officer could be found to have violated the Fourth Amendment by tasing an unarmed suspect who, in the course of an arrest, "present[ed] no significant 'active resistance' or threat"[6] at the time of the tasing. Id. at 10-11.

The case at hand is a horse of a quite different hue. There is no indication here that Gray, despite ample opportunity to do so, ever complied with Cummings's command to put her hands behind her back. Even when Cummings warned her that she would be tased, she did not comply but, rather, continued cursing and told him to "do it."

The second case upon which Gray relies is Ciolino v. Gikas, 861 F.3d 296 (1st Cir. 2017), which involved events occurring in 2013. There, a police officer grabbed the plaintiff in a crowded street and forced him to the ground without giving him any warning. See id. at 299-300. We held that the jury could find that although the plaintiff had "disobeyed a police order," he "was not given a chance to submit peacefully to arrest before significant force was used to subdue him" and, therefore, "an

_____

[6] We had no occasion in Parker to mull the implications of a qualified immunity defense. There, the officer waived any such defense. See 547 F.3d at 13.

- 20 -

'objectively reasonable police officer' would have taken a more measured approach."  Id. at 304 (quoting Raiche v. Pietroski, 623 F.3d 30, 39 (1st Cir. 2010)).

Once again, the case at hand is readily distinguishable. Cummings repeatedly told Gray that she needed to return to the hospital, and she adamantly refused to obey.  What is more, he warned her that he would use his Taser if she remained intransigent, yet she defied the warning.  Thus — unlike the plaintiff in Ciolino — Gray was afforded an adequate opportunity to submit to Cummings's authority before she was tased.

Gray cites a number of other cases in support of her argument that her resistance was "passive" rather than "active" and, thus, did not justify the use of the Taser.  This argument is deeply flawed.  Labels such as "passive" and "active" are generalizations and cannot serve as substitutes for a careful analysis of the facts of a particular case.  In point of fact, the Supreme Court — in an excessive force case — recently cautioned against "defin[ing] the clearly established right at a high level of generality."  City of Escondido, 139 S. Ct. at 503.  There, the Court reversed a denial of qualified immunity sought by an officer who had tackled a man after he had closed the door to a dwelling despite being instructed not to do so and "tried to brush past" the officer.  Id. at 502.  The Court criticized the Ninth Circuit for relying on "case law [that] involved police force against

- 21 -

individuals engaged in _passive_ resistance" without making any "effort to explain how that case law prohibited [the officer]'s actions in this case."  Id. at 503-04 (emphasis in original).  And in all events, respectable authority suggests that refusing to be handcuffed constitutes active resistance and may justify the use of a Taser.  See Hagans, 695 F.3d at 509 (collecting cases).

We add, moreover, that several of the cases cited by Gray involve deployment of a Taser subsequent to an initial Taser shock.  See, e.g., Meyers v. Baltimore County, 713 F.3d 723, 733-34 (4th Cir. 2013); Cyrus v. Town of Mukwonago, 624 F.3d 856, 859-63 (7th Cir. 2010).  Nothing of that sort happened here.[7]

In the last analysis, Gray does not cite any case, decided before her encounter with Cummings, that arose out of the use of a Taser on facts fairly comparable to the facts at hand. In the absence of either controlling authority or a consensus of

---

[7] In furtherance of her argument that an objectively reasonable officer standing in Cummings's shoes would have known that the degree of force used was unreasonable, Gray argues in her reply brief that the Town has a policy against tasing someone "known to be suffering from severe mental illness."  This argument is doubly waived:  first, it was not advanced in the district court, see McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991) ("It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal."); and second, it was not advanced in Gray's opening brief in this court, see Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990) ("[B]ecause the argument . . . surfac[ed] only in [appellant's] reply brief, it has been waived.").

persuasive authority to the contrary, we conclude that Cummings was entitled to qualified immunity.

As a fallback, Gray argues that the doctrine of qualified immunity, as expounded by the Supreme Court, should be modified or overruled. Gray did not raise this argument in the district court and, thus, cannot advance it here. See Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

2. **Town of Athol.** In addition to her section 1983 claim against Cummings, Gray makes a section 1983 failure-to-train claim against the Town. She alleges that her Fourth Amendment rights were violated by the Town's deficient training of its police officers (including Cummings) with respect to proper protocols for interacting with persons suffering from mental illness. Gray's evidence, though, falls well short of making out a failure-to-train claim against the Town.

We cut directly to the chase. "Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those

- 23 -

inadequacies."  Haley v. City of Boston, 657 F.3d 39, 52 (1st Cir. 2011).  A plaintiff typically must show a "pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train."  Connick v. Thompson, 563 U.S. 51, 62 (2011) (citing Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 409 (1997)). Here, however, Gray has made no such showing.

In an effort to close this gap, Gray offers expert testimony about appropriate police practices for interacting with persons with disabilities.  Building on this foundation, she insists that "coupled with the facts of the encounter," such evidence "create[s] questions of material fact as to whether the Town failed to properly train Cummings."  In our view, these assertions are insufficient to support a failure-to-train claim. It is not enough to show that the Town's training regimen was faulty; Gray must also show that the Town knew or had reason to believe that such a regimen had unconstitutional effects.  Gray has tendered no evidence of past violations sufficient to put the Town on notice of such effects.  Given this yawning gap in her proof, Gray has not made out a genuine issue of material fact as to whether the Town was deliberately indifferent to the risk of the alleged constitutional violation.  Consequently, her failure-to-train claim founders.  See id. at 72; Hill v. Walsh, 884 F.3d 16, 24 (1st Cir. 2018).

## B. **The State-Law Claims**.

Gray's supplemental state-law claims need not detain us. Gray concedes that the assault and battery and MCRA claims "rise and fall with . . . [her] § 1983 claim." This concession, coupled with Gray's failure to offer any developed argumentation with respect to these claims, ends our inquiry. See Torres-Arroyo v. Rullán, 436 F.3d 1, 7 (1st Cir. 2006) ("Gauzy generalizations are manifestly insufficient to preserve an issue for appellate review."). We deem waived any claim of error related to the disposition of Gray's assault and battery and MCRA claims.

The magistrate judge also granted summary judgment on Gray's malicious prosecution claim. On appeal, Gray does not challenge this ruling. Consequently, we deem the malicious prosecution claim abandoned. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

## C. **The ADA Claim.**

There is one last hill to climb: Gray's claim against the Town under the ADA. Some background is helpful.

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title I proscribes disability-related

discrimination in employment, see id. § 12112, and Title III proscribes disability-related discrimination in the provision of public accommodations (such as hotels, restaurants, and theaters), see id. §§ 12182, 12184. Neither of these titles is implicated here.

Title II broadly provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. § 12132. Gray's ADA claim against the Town is rooted in this Title.

To establish a violation of Title II, a plaintiff must show:

> (1) that [s]he is a qualified individual with a disability; (2) that [s]he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

Buchanan v. Maine, 469 F.3d 158, 170-71 (1st Cir. 2006) (quoting Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000)). A "qualified individual with a disability" is

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of

> auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).  In turn, the term "public entity" includes "any State or local government" as well as "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  Id. § 12131(1).

The Town does not gainsay either that Gray is a qualified person with a disability or that the Town is a public entity. Thus, the focal point of our inquiry is whether, during Gray's encounter with Cummings, she was "denied the benefits of [the Town's] services, programs, or activities or was otherwise discriminated against . . . by reason of [her] disability." Buchanan, 469 F.3d at 170-71.

Courts have identified two general theories describing ways in which a police officer may violate the ADA in executing an arrest.  The first such theory (which we shall call the "effects" theory) holds that a violation may be found when "police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity."  Gohier v. Enright, 186 F.3d 1216, 1220 (10th Cir. 1999).  The second such theory (which we shall call the "accommodation" theory) holds that a violation may be found when police officers "properly investigated and arrested a person with a disability for a crime

unrelated to that disability, [but] they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." Id. at 1220-21. Before us, Gray advances arguments under both theories.[8] With respect to the "effects" theory, Gray argues that the criminal charges filed against her are an indication that Cummings misperceived her failure to follow his commands as a crime rather than a symptom of her disability. With respect to the "accommodation" theory, Gray argues that Cummings should have accommodated her disability by "employ[ing] . . . time, patience, nonthreatening communication, monitoring from a distance, and contacting and waiting for assistance such as an ambulance or a mental health care professional."

In mounting our inquiry, we start with the uncontroversial premise that the services, programs, and activities of a municipal police department are generally subject to the provisions of Title II of the ADA. See, e.g., Haberle v.

---

[8] The magistrate judge concluded that "Gray's complaint very clearly proceeds solely on the basis of the second theory of liability — that is, an alleged failure to reasonably accommodate." This conclusion seems to overlook the allegation in Gray's amended complaint that the Town "brought criminal charges against [Gray] without taking her mental illness into account." Even so, any error was harmless: the magistrate judge prudently considered the merits of Gray's arguments under both the "effects" theory and the "accommodation" theory.

Troxel, 885 F.3d 170, 179-80 (3d Cir. 2018); Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998). Yet, three questions loom that are matters of first impression in this circuit:

- Does Title II apply to ad hoc police encounters with members of the public during investigations and arrests, and if so, to what extent?

- Assuming that Title II applies to the encounter that occurred here, may a public entity be held liable under Title II for a line employee's actions[9] on a theory of respondeat superior?

- Is proof of a defendant's deliberate indifference (as opposed to discriminatory animus) sufficient to support a plaintiff's claim for damages under Title II?

We are reluctant to plunge headlong into these murky waters. As we explain below, the answers to these questions are less than certain, and adjudicating Gray's ADA claim against the Town does not require us to run this gauntlet.

The first question asks whether and to what extent Title II of the ADA applies to ad hoc police encounters. The Fifth Circuit has held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar

---

[9] We use the term "line employee" to describe an employee who is not involved in policymaking.

- 29 -

incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."   Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000).   Other circuits, though, have charted a different course, holding that Title II applies without exception to ad hoc police encounters.   See, e.g., Haberle, 885 F.3d at 180 (concluding that "police officers may violate the ADA when making an arrest by failing to provide reasonable accommodations for a qualified arrestee's disability"); Bircoll v. Miami-Dade County, 480 F.3d 1072, 1085 (11th Cir. 2007) (explaining that "Title II prohibits discrimination by a public entity by reason of [plaintiff]'s disability" during investigations and arrests); see also Gohier, 186 F.3d at 1221 (stating that "a broad rule categorically excluding arrests from the scope of Title II . . . is not the law").   Under this approach, exigent circumstances attendant to a police officer's decisions during an ad hoc encounter simply weigh in the balance when evaluating the reasonableness of a prospective ADA accommodation. See Haberle, 885 F.3d at 181 n.11; Bircoll, 480 F.3d at 1085-86.[10]

_____

[10] The Ninth Circuit reached the same conclusion in Sheehan v. City & County of San Francisco, 743 F.3d 1211, 1232 (9th Cir. 2014).   The Supreme Court granted certiorari in Sheehan in order to resolve whether Title II of the ADA "requires law enforcement officers to provide accommodations to an armed, violent, and mentally ill suspect in the course of bringing the suspect into custody."   City & County of San Francisco v. Sheehan, 135 S. Ct. 1765, 1772 (2015).   The Court later concluded that certiorari on

While no circuit has found Title II of the ADA wholly inapplicable to ad hoc police encounters, the differences in approach indicate to us that we should tread cautiously. For present purposes, it is sufficient for us to assume, favorably to Gray, that Title II of the ADA applies to ad hoc police encounters (such as the encounter here) and that exigent circumstances may shed light on the reasonableness of an officer's actions.

The second question asks whether a public entity can be vicariously liable for money damages under Title II of the ADA based on the conduct of a line employee. This question arises because, in Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998), the Supreme Court held that a school district could not be held liable under Title IX of the Education Amendments of 1972 "unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [district]'s behalf has actual knowledge of discrimination." Id. at 290. Whether the rationale of Gebser should be extended to insulate public entities from liability under Title II of the ADA on a theory of respondeat superior is an open question. Compare, e.g., Duvall v. County of Kitsap, 260 F.3d 1124, 1141 (9th Cir. 2001) (stating that "public entity is liable

this question had been improvidently granted. See id. at 1774. The Court took pains to note, though, that whether Title II "applies to arrests is an important question." Id. at 1773.

- 31 -

for the vicarious acts of its employees" under Title II), with, e.g., Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 348-49 (11th Cir. 2012) (finding no respondeat superior liability under section 504 of Rehabilitation Act in light of Gebser).[11]  For present purposes, it is sufficient for us to assume, favorably to Gray, that the Town could be held vicariously liable under Title II for Cummings's actions.

The third question asks whether a showing of deliberate indifference is enough to support recovery of money damages under Title II.  Since a plaintiff must show "intentional discrimination" on the part of the public entity to be eligible for damages on a Title II claim, Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 126 (1st Cir. 2003), some uncertainty exists as to whether "deliberate indifference" is the functional equivalent of "intentional discrimination."  Several of our sister circuits have held that a showing of deliberate indifference may suffice to prove this element.  See, e.g., Haberle, 885 F.3d at 181; Duvall, 260 F.3d at 1138.  But the question is open in this circuit, and we have stated that, "under Title II, non-economic damages are only available when there is evidence 'of economic harm or animus toward the

_____

[11] As a general matter, Title II of the ADA "is to be interpreted consistently with" section 504 of the Rehabilitation Act, which prohibits disability discrimination by entities receiving federal financial assistance.  Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998).

disabled.'"  Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 17 (1st Cir. 2006) (quoting Nieves-Márquez, 353 F.3d at 126-27).  This case does not require us to parse whether our use of the word "animus" demands more than a showing of deliberate indifference, cf. S.H. ex. rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 263 (3d Cir. 2013) (interpreting Nieves-Márquez as requiring "a higher showing of intentional discrimination than deliberate indifference"), particularly since the Town has not advanced such an argument.  For present purposes, it is sufficient for us to assume, favorably to Gray, that deliberate indifference is the appropriate standard.

Adjudicating Grays's ADA claim against the Town does not require us to run the gauntlet of these questions.  After all, we have admonished before — and today reaffirm — that "courts should not rush to decide unsettled legal issues that can easily be avoided."  United States v. Gonzalez, 736 F.3d 40, 40 (1st Cir. 2013).  Consistent with this prudential principle, we decline to answer any of the three questions identified above.  No matter how the loaf is sliced, Gray was obliged at a bare minimum to make out a genuine issue of material fact as to Cummings's deliberate indifference to the risk of an ADA violation.

In this context, such a showing requires proof that the defendant knew that an ADA-protected right was likely to be abridged, yet neglected to take available preventative action

- 33 -

notwithstanding such knowledge.  See Haberle, 885 F.3d at 181; Duvall, 260 F.3d at 1139-40.  In other words, to hold the Town vicariously liable under Title II based on Cummings's deliberate indifference, Gray would have to show that Cummings knew that Gray had a disability that required him to act differently than he would otherwise have acted, yet failed to adjust his behavior accordingly.  See, e.g., Crane v. Lifemark Hosps., Inc., 898 F.3d 1130, 1136 (11th Cir. 2018); Duvall, 260 F.3d at 1140.  Thus, to prevail on her version of the "effects" theory, Gray would at least have to show that Cummings knew that her failure to follow his orders was a symptom of her mental illness rather than deliberate disobedience (warranting criminal charges).  Similarly, to prevail on her version of the "accommodation" theory, Gray would at least have to show that Cummings knew that there was a reasonable accommodation, which he was required to provide.  Gray has not made either such showing.

To be sure, it is undisputed that Cummings knew that Gray was a section 12 patient and, thus, had a disability (specifically, that she suffered from an unspecified mental illness).  See Mass. Gen. Laws ch. 123, § 12.  But Gray has not shown that Cummings had any particularized knowledge about the nature or degree of Gray's disability.  As we have explained, see supra Part II.A, the fact that Gray was a section 12 patient served only to put Cummings on notice that she had been deemed a danger

- 34 -

to herself or to others.  There is insufficient evidence to suggest that Cummings knew either that Gray suffered from bipolar disorder or that she was experiencing a manic episode.  Without such particularized knowledge, Cummings had no way of gauging whether the conduct that appeared unlawful to him was likely to be a manifestation of the symptoms of Gray's mental illness.  So, too, without such particularized knowledge, Cummings had no way of gauging what specific accommodation, if any, might have been reasonable under the circumstances.

Of course, Gray has adduced evidence that national police standards provide protocols for dealing with individuals suffering from any type of mental illness.  Critically, though, Gray has not adduced any evidence showing that Cummings knew of the existence of such standards.[12]  Consequently, Cummings had no way of knowing that an ADA-protected right was likely to be jeopardized by his actions.

---

[12] For the sake of completeness, we again note that the Town has a policy, which states that Tasers should not be used against "[t]hose known to be suffering from severe mental illness."  Based on this policy, it might be argued that refraining from using a Taser against Gray would have been a reasonable accommodation for her disability.  It might also be argued that, in tasing Gray in contravention of the policy, Cummings exhibited deliberate indifference.  The rub, though, is that Gray has not advanced any such argument either below or in her appellate briefing.  "In the absence of extraordinary circumstances, none of which are apparent here, we have regularly declined to consider points which were not seasonably advanced below." Clauson v. Smith, 823 F.2d 660, 666 (1st Cir. 1987).

Nor were Cummings's actions so plainly antithetic to the ADA as to obviate the knowledge requirement. See Haberle, 885 F.3d at 182. The record makes manifest that Cummings tried to talk to Gray before physically engaging with her, telling her repeatedly that she needed to return to the hospital. He followed her from a distance and did not make physical contact with her until she reversed direction and moved toward him. And in the ensuing encounter, he warned her that she would be tased if she did not put her hands behind her back and gave her several chances to comply before using the Taser (in the least intrusive mode available).

Gray has also offered evidence that in failing to wait for backup or to call an ambulance prior to approaching her, Cummings fell short of nationally recognized police standards. But as we have said, she has not shown that Cummings knew of such standards; and in all events, "falling below national standards does not, in and of itself, make the risk of an ADA violation" so obvious as to eliminate the knowledge requirement. Id.

By the same token, Gray has not offered evidence sufficient to sustain a claim of direct liability against the Town. To make out such a claim, Gray could show that the Town's "existing policies caused a failure to 'adequately respond to a pattern of past occurrences of injuries like [hers].'" Id. at 181 (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 136 (3d Cir. 2001)). Or

she could show "that the risk of . . . cognizable harm was 'so great and so obvious'" as to override the requirement of demonstrating a pattern. Id. (quoting Beers-Capitol, 256 F.3d at 136-37). Gray has not made either showing: she has proffered no evidence of a pattern, nor has she shown an obvious risk of harm. At most, she has put forth evidence that the Town's policies failed to comply with national standards. But such a failure — without more — does not render the risk of harm so great and obvious as to excuse a failure to satisfy the pattern requirement. See id. at 182.

To this point, we have explained why Gray's claim for money damages is impuissant. But Gray's amended complaint also prays for injunctive relief. This form of redress, too, is beyond Gray's reach. Past injury, in and of itself, "is an insufficient predicate for equitable relief." Am. Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992). To have standing to pursue injunctive relief, a plaintiff must "establish a real and immediate threat" resulting in "a sufficient likelihood that [s]he will again be wronged in a similar way." Id. (quoting Los Angeles v. Lyons, 461 U.S. 95, 109, 111 (1983)); see Updike v. Multnomah County, 870 F.3d 939, 948 (9th Cir. 2017), cert. denied sub nom. Multnomah County v. Updike, 139 S. Ct. 55 (2018) (finding that ADA plaintiff "lack[ed] standing to pursue his claims for injunctive relief"); Dudley v. Hannaford Bros. Co., 333 F.3d 299, 306 (1st

Cir. 2003) (requiring "real and immediate threat of ongoing harm" for injunctive relief in ADA case). Gray cannot clear this hurdle. When all is said and done, it is not enough for Gray to show that because she has bipolar disorder, she is likely to encounter the police again. She must show that she is likely to be tased once more, see Lyons, 461 U.S. at 105-06, and she has not managed any such showing.

Because there is no remedy available to Gray under Title II of the ADA, it follows that the district court did not err in entering summary judgment for the Town on Gray's ADA claim. See Carmona-Rivera, 464 F.3d at 18 (affirming summary judgment for defendants where no remedy was available to plaintiff on ADA claim).

## III. CONCLUSION

We need go no further. We add only that this is a hard case — a case that is made all the more difficult because of two competing concerns: our concern for the rights of the disabled and our concern that the police not be unduly hampered in the performance of their important duties. In the end, though, we think that the protections provided by Title II of the ADA can be harmonized with the doctrines of excessive force and qualified immunity, as explicated by the Supreme Court, to achieve a result that gives each of these competing concerns their due. We think that our ruling today — which establishes in this circuit that a

jury could supportably find the use of a Taser to quell a nonviolent, mentally ill person who is resisting arrest to be excessive force — satisfies this exacting standard.

**Affirmed.**